1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**
8          **EASTERN DISTRICT OF CALIFORNIA**
9
10
11   KENNETH H. CASNER,                    Case No. 1:10-cv-01081-SKO-HC
12           Petitioner,                   ORDER DENYING PETITION FOR WRIT OF
                                           HABEAS CORPUS (DOC. 1), DIRECTING
13       v.                                ENTRY OF JUDGMENT FOR RESPONDENT,
                                           AND DECLINING TO ISSUE A
14                                         CERTIFICATE OF APPEALABILITY
15   ELVIN VALENZUELA, Warden,
16           Respondent.
17
18
19       Petitioner is a state prisoner proceeding with counsel with a

20   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

21   Pursuant to 28 U.S.C. 636(c)(1), the parties have consented to the

22   jurisdiction of the United States Magistrate Judge to conduct all

23   further proceedings in the case, including the entry of final

24   judgment, by manifesting their consent in writings signed by the

25   parties or their representatives and filed by Petitioner on July 13,

26   2012, and on behalf of Respondent on September 26, 2012.

27       Pending before the Court is the petition, which was filed on

28   June 8, 2010, and transferred to this division of this Court on June

1

15, 2010.  Respondent filed an answer with supporting documentation on August 15, 2012.  Petitioner filed a traverse on January 13, 2013.

I.  Jurisdiction

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. -, 131 S.Ct. 13, 16 (2010) (per curiam).  Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights.  The challenged judgment was rendered by the Tuolumne County Superior Court (TCSC), which is located within the territorial jurisdiction of this Court.  28  U.S.C. §§ 84(b), 2254(a), 2241(a), (d).

Respondent filed an answer on behalf of Respondent Kathleen Dickinson, Warden of the California Medical Facility at Vacaville, California, where Petitioner was incarcerated.  However, pursuant to Petitioner's motion, Elvin Valenzuela, Warden of the California Men's Colony at San Luis Obispo, California, was substituted for Warden Dickinson.  Petitioner has, therefore, named as a respondent a person who has custody of the Petitioner within the meaning of 28

2

U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules). <u>See</u>, <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994). Accordingly, this Court has jurisdiction over the subject matter of this action and over the person of Respondent Valenzuela.

II.  <u>Procedural Summary</u>

On October 1, 2008, following a jury trial, Petitioner was found guilty of forcible spousal rape in violation of Cal. Pen. Code § 262(a)(1) (count 1), kidnapping in violation of Cal. Pen. Code § 207 (a lesser included offense of the charged offense of kidnapping to commit spousal rape in violation of Cal. Pen. Code § 209(b)(1)) (count 2), first degree burglary with intent to commit larceny and any felony in violation of Cal. Pen. Code § 459 (count 3), criminal threats in violation of Cal. Pen. Code § 422 (count 4), unlawful possession of a firearm after conviction of spousal battery and corporal injury in violation of Cal. Pen. Code § 12021(c)(1) (count 5), first degree residential burglary with intent to commit larceny and any felony in violation of Cal. Pen. Code § 459 (count 6), and grand theft of a firearm in violation of Cal. Pen. Code § 487(d) (count 7).  (CT 191-200.)

In connection with the spousal rape conviction in count 1, the jury found that Petitioner's movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying crime of spousal rape within the meaning of Cal. Pen. Code § 667.61(a) and (d); Petitioner committed the spousal rape during the commission of a first degree burglary with the intent to commit spousal rape; and Petitioner personally used a firearm in the commission of the offense within

3

the meaning of Cal. Pen. Code §§ 667.61(b), 12022.5(a)(1) and 12022.53(b). (CT 192-93.)  The jury found that Petitioner personally used a firearm in the commission of the kidnapping within the meaning of Cal. Pen. Code §§ 12022.5(a)(1) and 12022.53(b).  (Id. at 195.)  The jury found that in connection with the first degree burglary charged in count 3, victim S.C. was present at the time of the commission of the offense, and Petitioner personally used a firearm in the commission of the offense within the meaning of Cal. Pen. Code §§ 12022.5(a)(1) and 12022.53(b).  (Id. at 196-97.)  The jury further found that Petitioner personally used a firearm in the commission of the criminal threats within the meaning of Cal. Pen. Code §§ 12022.5(a)(1) and 12022.53(b).  (Id. at 198.)

On November 10, 2008, Petitioner was sentenced to an indeterminate term of twenty-five years to life on the spousal rape; a consecutive, determinate upper term of eight years on the kidnapping plus an enhancement of ten years for personal use of a firearm in the commission of the kidnapping; a concurrent two-year middle term for the possession of the firearm; middle terms on the first burglary and the criminal threats, which were stayed; a consecutive term of sixteen months, or one-third of the middle term, on the second burglary; and a middle term on the grand theft, which was stayed.  Petitioner's total sentence was thus twenty-five years to life plus a determinate term of nineteen years and four months. (CT 265-69.)

The Court of Appeal of the State of California, Fifth Appellate District (CCA) affirmed the judgment on appeal in a decision filed on August 21, 2009.  (Ans., Ex. A, doc. 28-1, 1-14.)

///

4

1    On October 28, 2009, the California Supreme Court (CSC)

2 summarily denied Petitioner's petition for review without a

3 statement of reasoning or authority.  (LD 4, LD 5.)[1]  Petitioner did

4 not file any habeas corpus petitions with respect to the judgment in

5 the state courts.  (Doc. 28, 8:12-13.)

6    Petitioner filed the instant petition on June 8, 2010.  On

7 March 12, 2012, the Court acknowledged Petitioner's request to

8 withdraw claims as to which state court remedies had not been

9 exhausted concerning cumulative error and trial and appellate

10 counsel's failure to raise Petitioner's mental illness as a defense.

11 The claims were dismissed without prejudice, and the case has

12 proceeded on Petitioner's claims that trial counsel was ineffective

13 in failing to move to strike inadmissible character evidence of a

14 car dealer's testimony concerning her fear of Petitioner, the trial

15 court violated due process by failing to give a limiting instruction

16 concerning the jury's consideration of the victim's extra-judicial

17 statement to a medical examiner, and trial counsel was ineffective

18 in failing to request such a limiting instruction.

19    III.  Factual Summary

20    In a habeas proceeding brought by a person in custody pursuant

21 to a judgment of a state court, a determination of a factual issue

22 made by a state court shall be presumed to be correct.  The

23 petitioner has the burden of producing clear and convincing evidence

24 to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1);

25 Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).  This

26 presumption applies to a statement of facts drawn from a state

27 appellate court's decision.  Moses v. Payne, 555 F.3d 742, 746 n.1

28

[1] "LD" refers to documents lodged by the Respondent in connection with the answer.

(9th Cir. 2009).  The following statement of facts is taken from the decision of the CCA in case number F056594, which was filed on August 21, 2009.

### FACTUAL AND PROCEDURAL SUMMARY

Casner was six feet six inches tall and weighed 280 pounds in November 2007. On November 26, 2007, Casner began hitting his and S.C.'s 22-year-old son, C.C. When S.C. attempted to intervene, Casner said, "You want some?" and proceeded to hit S.C. As a result of this incident, criminal charges were filed against Casner and a criminal protective order issued.

In December 2007, S.C. obtained a civil restraining order against Casner. Shortly thereafter, in January 2008, S.C. filed for dissolution of the marriage. Also in January 2008, the criminal protective order was extended for three years.

Casner repeatedly called S.C. at home, at work, and on her cell phone. In February 2008, she contacted the sheriff's department to report Casner's violations of the protective and restraining orders. While a deputy was interviewing S.C. at her home, Casner again called the house, a violation of the orders. A criminal case for violation of the protective and restraining orders was initiated and still pending as of May 2008.

C.C. and his 20-year-old sister, B.C., lived with S.C. C.C. had a full-time job and B.C. was attending classes at a school that taught independent living skills to the developmentally delayed. The usual routine was that C.C. would leave for work around 6:30 a.m. and drop off B.C. at the bus stop to catch the school bus. S.C., a registered nurse, worked a night shift from 6:30 p.m. to 7:30 a.m. and usually arrived home about an hour or so after her shift ended.

On April 23, 2008, Casner purchased a Subaru wagon, paying cash and registering the car in B.C.'s name, although B.C. did not have a license and did not drive. He left the car at the dealership to have the windows tinted, but did not pick up the car when this work was completed.

On May 6, 2008, Casner parked his truck at the dealership, put a duffle bag in the Subaru, and drove the Subaru to a

6

remote wooded area about 16 miles from S.C.'s house. Casner took a cab back to town, telling the cabbie his car had broken down and was being towed. The cabbie dropped him off at the dealership and Casner drove away in his truck.

On the morning of May 7, after C.C. and B.C. had left and before S.C. arrived home, Casner entered S.C.'s home through a window and hid in C.C.'s bedroom. S.C. arrived home around 9:00 a.m., did a few small chores around the house, and climbed into bed to go to sleep. After falling asleep, the next thing S.C. remembered was seeing a "shadow coming through the bedroom door of a man." Next, "[Casner] rushed up to the bed and put his hand over my mouth and put a gun to my head and told me if I made any noise, he would blow my head off with a 357."

S.C. was scared. She lay there with the gun held to her head, while Casner flipped her over onto her stomach on the bed and handcuffed her hands behind her back. Casner ordered her to turn over and when she could not, he flipped her over onto her back. Casner held up some zip ties and told her if she "put up a struggle," he would bind her feet. Casner told S.C. he wanted to spend time with her and then he "planned to kill [S.C.] and kill himself."

Casner told S.C. he wanted her to go away with him. When she refused, Casner pulled out a plastic baggie with pills in it and said, "They're pills to drug you if you won't come." Casner said he had Seroquel and OxyContin in the baggie. Casner told S.C. how upset he was because she had turned him in for making phone calls and how he would have to "serve time" as a result.

Casner began asking S.C. to kiss him. When she repeatedly said "no," he climbed on top of her and tried to kiss her, but she kept turning her head. Casner then released one of S.C.'s hands from the handcuffs and pulled her nightgown off. Casner forced her legs apart and forced her to submit to oral copulation and then raped her. S.C. was crying and asked Casner, "You know what this is, right?" Casner responded, "Yeah, rape."

After he finished raping S.C., Casner told her to swallow one of the pills he had brought. She responded, "No," and clenched her mouth closed. Casner grabbed her face,

7

squeezed hard until her mouth opened, and then shoved a pill into S.C.'s mouth. Casner held her mouth closed and told her to swallow, continuing to hold her mouth closed until she swallowed.

After the rape, Casner told her he needed to get his bag, so Casner took her down the hall to their son's room. In their son's room is a trap door in the floor of the closet that leads to an area under the house. Casner opened up the trap door, reached down, and pulled out a duffle bag. Casner took a douche kit from the bag and instructed S.C. to use it.

By this time, S.C. was very sleepy from the effects of the pill Casner forced on her and she was wobbling when she walked. Casner took her through the house and out to her car, where he placed her in the passenger seat. S.C. did not remember anything after that until about 2:00 o'clock in the afternoon, when Casner shook her awake and told her to call in sick to work and to call their children.

When S.C. awoke, she and Casner were in her car in a forested area. There was a Subaru parked nearby, which Casner said was his. Casner moved her from her car to the Subaru and had her call in sick to work. Casner then instructed her to call home and leave a message on her answering machine for their children, telling them that she was going out with friends and would be back later.

After making the calls, S.C. nodded off again. When she awoke, she pleaded with Casner to take her home; he refused. Casner had S.C. climb into the back of the Subaru, where she was hidden by a cover, while he drove. At some point, Casner indicated they were near Bakersfield. When Casner needed to pull into a gas station, he told S.C. if she tried anything he would kill her.

Casner had S.C. get into the front seat when they left the gas station. While he was driving, he put his hands inside her pants and began rubbing her vaginal area. S.C. told him he was "rubbing [her] raw" and she asked him to stop; he "didn't care." Casner pulled into a motel parking lot, opened up the back of the Subaru, and pulled out an envelope "an inch thick" containing money. Casner paid for a room.

Inside the motel room, S.C.'s cell phone reflected that her children had called numerous times trying to locate her. Casner had S.C. call them, and she managed to reach her son and daughter. Casner was listening to her conversation while she told them she was staying with friends and would be home tomorrow. Her son, C.C., asked "Are you okay? Does dad have you?"

Shortly after concluding her conversation with her children, a deputy sheriff called. The deputy indicated that S.C.'s children were worried and asked exactly where she was. Casner told her to say she was with a guy named Mike and that she would be home in the morning. The deputy asked where she was, the location of the house where she was, and if she could see out the window. S.C. responded that she did not know where the house was at and that she could not see out the window. After the deputy concluded his call, C.C. called to tell S.C. they were trying to find her.

Casner had S.C. take off most of her clothes and climb into bed. Casner got into bed with her and S.C. asked him to leave her alone. Casner again forced her to submit to oral sex and then raped her. Afterwards, Casner decided they needed to get going "before they get organized" and S.C. was found.

Casner told S.C. that if she promised not to say anything about what had happened, he would take her back home and let her go. Casner told her if she could not "stick with this plan" he would have to go back to his "original plan, which was to kill us both." S.C. promised not to tell.

Casner was driving while they headed back to S.C.'s house. At one point, Casner pulled another douche kit from his duffle bag and said he wanted her to use it. Casner stopped at a fast food location and told S.C. to use the douche kit in the bathroom while he ordered food. Casner was waiting when she came out of the bathroom and he took her to the car.

At one point on the drive back, they crossed a bridge spanning a river. Casner stopped on the bridge and pulled out the gun, which Casner told her was a "Taurus." Casner dropped the gun over the side of the bridge.

9

After Casner dropped her where they had left her car, he continued to follow her and stop her on the road. S.C. was afraid she would not get out of her situation alive after all.

When she returned home, her son drove her to the sheriff's department to make a report. S.C. was then taken to the hospital for a forensic sexual assault examination. S.C.'s pubic hair was positive for bodily secretions in a Woods lamp test. Her vaginal area was red and swollen and there were two lacerations. The results of the examination were consistent with S.C.'s description of the sexual assaults.

The sheriff's department had S.C. make a pretextual phone call to Casner. In the call, S.C. indicated the sheriff's department wanted her to come down and make a statement because she had been reported missing. S.C. said she did not know what to say, and Casner told her she did not have to give a statement.

The sheriff's department found the gun in the river below the bridge, where S.C. indicated Casner had dropped it. The gun was fully loaded with seven bullets. The gun was identified as belonging to Michelle Vinci.

Vinci had dated Casner briefly. She kept a Taurus .357 handgun in a case in her bedroom. Casner had been in her bedroom when they were dating, but she did not give him or anyone else permission to take the gun. On April 30, 2008, Vinci discovered the gun was missing and she reported the theft.

...

Casner was incarcerated in the jail pending trial. While awaiting trial, he asked his cell mate, Frankie Henley, if fingerprints could be recovered from stainless steel after it had been in water. Henley said Casner admitted entering his wife's home with a gun, waiting for her to come home, drugging her, driving away with her, and later dropping the gun in the river. Casner said he was sorry he had not killed S.C. and offered to pay Henley to do it when Henley was released.

At trial, Casner denied stealing Vinci's gun or even knowing that she had a gun. Casner admitted violating the restraining orders and going to S.C.'s house on May 7,

10

2008, but denied he had a gun. He testified S.C. voluntarily invited him into her home and her bedroom and that they had consensual sex. He denied handcuffing her, bringing zip ties or douche kits with him, and denied drugging her. Casner also denied forcing S.C. to accompany him out of town against her will and claimed that the sexual encounter in the motel room was consensual.

(Doc. 28-1, 3-8.)

IV.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of

11

facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court
need not have cited Supreme Court precedent or have been aware of
it, "so long as neither the reasoning nor the result of the state-
court decision contradicts [it]."  Early v. Packer, 537 U.S. 3, 8
(2002).

A state court unreasonably applies clearly established federal
law if it either 1) correctly identifies the governing rule but then
applies it to a new set of facts in an objectively unreasonable
manner, or 2) extends or fails to extend a clearly established legal
principle to a new context in an objectively unreasonable manner.
Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see,
Williams, 529 U.S. at 407.

An application of clearly established federal law is
unreasonable only if it is objectively unreasonable; an incorrect or
inaccurate application is not necessarily unreasonable.  Williams,
529 U.S. at 410.  A state court's determination that a claim lacks
merit precludes federal habeas relief as long as it is possible that
fairminded jurists could disagree on the correctness of the state
court's decision.  Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770,
786 (2011).  Even a strong case for relief does not render the state
court's conclusions unreasonable.  Id.  To obtain federal habeas
relief, a state prisoner must show that the state court's ruling on
a claim was "so lacking in justification that there was an error
well understood and comprehended in existing law beyond any
possibility for fairminded disagreement."  Id. at 786-87.  The
§ 2254(d) standards are "highly deferential standard[s] for
evaluating state-court rulings" which require that state court
decisions be given the benefit of the doubt, and the Petitioner bear

the burden of proof.  <u>Cullen v. Pinholster</u>, 131 S.Ct. at 1398.

Habeas relief is not appropriate unless each ground supporting the

state court decision is examined and found to be unreasonable under

the AEDPA.  <u>Wetzel v. Lambert</u>, --U.S.--, 132 S.Ct. 1195, 1199

(2012).

In assessing under section 2254(d)(1) whether the state court's

legal conclusion was contrary to or an unreasonable application of

federal law, "review... is limited to the record that was before the

state court that adjudicated the claim on the merits." <u>Cullen v.</u>

<u>Pinholster</u>, 131 S.Ct. at 1398. Evidence introduced in federal court

has no bearing on review pursuant to § 2254(d)(1).  <u>Id.</u> at 1400.

Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding

brought by a person in custody pursuant to a judgment of a state

court, a determination of a factual issue made by a state court

shall be presumed to be correct; the petitioner has the burden of

producing clear and convincing evidence to rebut the presumption of

correctness.  A state court decision on the merits based on a

factual determination will not be overturned on factual grounds

unless it was objectively unreasonable in light of the evidence

presented in the state proceedings. <u>Miller-El v. Cockrell</u>, 537 U.S.

322, 340 (2003).

A state has adjudicated a claim on the merits within the

meaning of § 2254(d) when it decides the petitioner's right to

relief on the basis of the substance of the constitutional claim

raised, rather than denying the claim because of a procedural or

other rule precluding state court review of the merits. <u>Lambert v.</u>

<u>Blodgett</u>, 393 F.3d 943, 969 (9th Cir. 2004).

13

Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Thus, where the California Supreme Court denies a habeas petition without citation or comment, a district court will "look through" the unexplained decision of that state court to the last reasoned decision of a lower court as the relevant state-court determination.  Ylst v. Nunnemaker, 501 U.S. at 803-04; Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).  A petitioner has the burden to overcome or rebut the presumption by strong evidence that the presumption, as applied, is wrong.  Ylst, 501 U.S. at 804.

Here, this Court will look through the unexplained decision of the CSC to the decision of the CCA, which was the last reasoned decision addressing Petitioner's claims.

V.   Ineffective Assistance of Counsel in Failing to Move
     to Strike a Car Dealer's Testimony

Petitioner argues that he suffered a violation of his Sixth and Fourteenth Amendment right to the effective assistance of counsel when his trial counsel failed to move to strike the testimony of a saleswoman at the automobile dealership where Petitioner bought the Subaru.

The trial transcript reveals that Amy Lane testified she had another salesperson sell the Subaru to Petitioner, who came to the dealership five or six times and paid cash for the vehicle. Petitioner drove the Subaru and returned it to the lot on various occasions.  Lane tried not to have any contact with Petitioner.

When the prosecutor asked her why, she replied, "I was scared of him."  When the prosecutor asked why she was scared, the trial court stated, "Counsel, I'm going to interject.  I don't think that is relevant.  Move on."  (1 RT 152-160.)

A.   The State Court's Decision

The pertinent part of the CCA's decision is as follows:

**I. Ineffective Assistance of Counsel**

Casner contends his trial counsel was ineffective because counsel failed to move to strike the car salesman's comment that she was "scared" of defendant. He claims this failure was prejudicial because this was a "reasonably close case" as to whether he harbored the intent to commit a felony at the time he entered S.C.'s home or whether he merely was attempting to effect a "peaceful reconciliation."

Casner has the burden of proving defense counsel rendered ineffective assistance. (*People v. Cox* (1991) 53 Cal.3d 618, 655.) In order to prove ineffective assistance, Casner must demonstrate that counsel's performance was deficient and that counsel's action or failure to act was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) When a claim of ineffective assistance is based upon defense counsel's failure to make a motion, as here, the defendant must prove "not only the absence of a reasonable tactical explanation for the omission but also that the motion or objection would have been meritorious." (*People v. Mackenzie* (1995) 34 Cal.App.4th 1256, 1272.)

We disagree with Casner's fundamental assessment of the case as "reasonably close." There was virtually no evidence that Casner intended anything other than rape and murder when he entered S.C.'s home, except for his self-serving statements.

Casner spent considerable time, effort, and funds in planning these crimes. He purchased a car in his daughter's name and paid cash; hence, the car would not be

15

traceable to him. He had the windows tinted so people and
items in the car could not be seen. Casner obtained potent
prescription drugs with which to sedate his estranged wife
and purchased douche kits in an attempt to erase any trace
of sexual intercourse. Casner stole a gun and brought that
loaded gun with him to S.C.'s house. Immediately upon
entering S.C.'s bedroom, Casner rushed to the bed, placed
the weapon against S.C.'s head, and told her he would
shoot her if she made any noise. Casner then proceeded to
tell S.C. that he wanted to spend time with her-apparently
his euphemism for forced sex-before killing her. Casner's
very entry into the home violated criminal and civil
restraining orders.

Casner's actions and words provide overwhelming evidence
of felonious intent at the time he entered S.C.'s house.
Even if we were to credit Casner's argument that he
harbored an intent of effecting a peaceful reconciliation
when he initially entered S.C.'s home, that intent clearly
was combined with the intent to rape and murder her if his
attempts at reconciliation did not work. The evidence is
clear that he was prepared to overcome resistance and act
forcibly if necessary-he brought with him a loaded gun and
medication with which to sedate S.C. in order to prevent
any resistance by her. Even if the use of force was a
secondary, or contingent, plan on Casner's part, he still
harbored the requisite intent upon entry, although that
intent may have been "contingent" in his mind. (*People v.
Fond* (1999) 71 Cal.App.4th 127, 132.)

Furthermore, even if we assume Casner did not harbor any
intent to commit a felony at the moment he illegally
entered S.C.'s house, the evidence is abundantly clear he
harbored a felonious intent at the time he entered S.C.'s
bedroom. His first actions upon entering the bedroom were
to hold a gun to S.C.'s head and tell her he would kill her
if she made noise. He then proceeded to handcuff
and rape her. If Casner did not harbor a felonious intent
at the time he entered S.C.'s house, but did harbor a
felonious intent at the time he entered her bedroom,
burglary still lies. (*People v. Abilez* (2007) 41 Cal.4th
472, 509; *People v. Sparks* (2002) 28 Cal.4th 71, 87.) As
the California Supreme Court held in *Sparks*, the word
"'room'" in section 459 "must be given its ordinary
meaning," and the entry with the requisite intent while
within a home into another room of the house, particularly
a bedroom, is burglary. (*Sparks*, at pp. 86-87.)

16

> Although Casner claims his failure to overpower S.C.
> immediately after she entered the home is evidence that he
> had a desire for a peaceful reconciliation, we disagree.
> In all likelihood, Casner waited to overpower S.C. to
> lessen the possibility that she would cry out and be heard
> by a neighbor or passerby. Further, waiting until S.C. was
> in the bedroom facilitated the rape.
>
> This is not a close case. Casner's attempt to characterize
> his actions as "clumsy attempts at seduction" and an
> attempt to reconcile with his estranged wife is ludicrous
> and not supported by the facts. Under the facts of this
> case, there is no possibility the jury would have
> disbelieved S.C.'s testimony and credited Casner's version
> of events. Therefore, even if we assume arguendo defense
> counsel should have moved to strike the comment about the
> car salesperson being "scared" of Casner, the failure to
> move to strike was not prejudicial because it is not
> reasonably probable the outcome would have been more
> favorable to Casner absent any error. (*Strickland, supra*,
> 466 U.S. at p. 687; *Ledesma, supra*, 43 Cal.3d at pp. 216-
> 218.)

(Doc. 28-1, 8-10.)

>       B.   Analysis

The law governing claims concerning ineffective assistance of

counsel is clearly established for the purposes of the AEDPA

deference standard set forth in 28 U.S.C. § 2254(d).   Premo v.

Moore, -U.S. -, 131 S.Ct. 733, 737-38 (2011); Canales v. Roe, 151

F.3d 1226, 1229 n.2 (9th Cir. 1998).

To demonstrate ineffective assistance of counsel in violation

of the Sixth and Fourteenth Amendments, a convicted defendant must

show that 1) counsel's representation fell below an objective

standard of reasonableness under prevailing professional norms in

light of all the circumstances of the particular case; and 2) unless

17

prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  A petitioner must identify the acts or omissions of counsel that are alleged to have been deficient.  Strickland, 466 U.S. at 690.  This standard is the same standard that is applied on direct appeal and in a motion for a new trial.  Id. at 697-98.

In determining whether counsel's conduct was deficient, a court should consider the overall performance of counsel from counsel's perspective at the time of the representation.  Strickland, 466 U.S. at 689.  There is a strong presumption that counsel's conduct was adequate and within the exercise of reasonable professional judgment and the wide range of reasonable professional assistance.  Id. at 688-90.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."  Id. at 687.

In determining prejudice, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.  Strickland, 466 U.S. at 694.  In the trial context, the question is thus whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.  Id. at 695.  This Court must consider the totality of the evidence before the fact finder and determine

18

whether the substandard representation rendered the proceeding

fundamentally unfair or the results unreliable.  Id. at 687, 696.

    Where the state court has applied the correct, clearly

established federal law to a claim concerning the ineffective

assistance of counsel, a federal district court analyzes the claim

under the "unreasonable application" clause of § 2254(d)(1), pursuant

to which habeas relief is warranted where the correct law was

unreasonably applied to the facts.  Weighall v. Middle, 215 F.3d

1058, 1062-62 (2000) (citing Williams v. Taylor, 529 U.S. 362

(2000)).

    The Supreme Court has described the high bar presented by

§ 2254(d)(1) for prevailing on a claim of ineffective assistance of

Counsel as follows:

> "To establish deficient performance, a person challenging a
> conviction must show that 'counsel's representation fell
> below an objective standard of reasonableness.'
> [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court
> considering a claim of ineffective assistance must apply a
> 'strong presumption' that counsel's representation was
> within the 'wide range' of reasonable professional
> assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's
> burden is to show 'that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.' Id., at 687 [104 S.Ct.
> 2052].
>
> "With respect to prejudice, a challenger must demonstrate
> 'a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would
> have been different.' ...
>
> " 'Surmounting Strickland's high bar is never an easy task.'
> Padilla v. Kentucky, 559 U.S. ----, ---- [130 S.Ct. 1473,
> 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance

claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, -U.S. -, 131 S.Ct. 733, 739-40 (2011) (quoting

Harrington v. Richter, -U.S.-, 131 S.Ct. 770 (2011)).

///

20

Here, as Respondent notes, defense counsel may have been acting in accordance with a rational tactical choice not to move to strike the testimony because doing so after the trial court had already foreclosed further inquiry might have served to highlight the witness's testimony concerning her fear of Petitioner.  Counsel have wide latitude in making tactical decisions.  In a § 2254 proceeding, a defendant must overcome a presumption that a challenged action of counsel might be considered sound trial strategy under the circumstances and was undertaken in the exercise of reasonable professional judgment.  <u>Strickland</u>, 466 U.S. at 689.

In her testimony, the saleswoman did not provide any details to support her fear of Petitioner.  The saleswoman testified to a series of unusual actions undertaken by Petitioner in connection with his purchase of the car.  Petitioner came in on April 23, 2008 (two weeks before the charged crimes occurred) and purchased the vehicle; he had the windows tinted, drove the vehicle, and then returned to park it at the lot on several occasions.  Finally on or about April 30, 2008, Petitioner drove in to the lot, drove the Subaru away, and returned in a taxi to pick up and depart in the vehicle that he had driven to the dealership. (RT 154-57.)

Under the circumstances, counsel would have been reasonable in deciding that a motion to strike would have underscored the saleswoman's testimony concerning not only her fear of Petitioner, but also Petitioner's unusual behavior concerning the car, which was

21

damaging because it warranted a strong inference that Petitioner was

carefully planning to use the car in the commission of the offenses.

Further, even assuming reasonable counsel would have moved to strike

the bare statements that the saleswoman tried to avoid Petitioner

and was scared of him, the state court properly decided that any

failure of defense counsel to move to strike the evidence was not

prejudicial.  There was significant evidence before the trier of

fact independently providing a basis for fear of the Petitioner,

including Petitioner's testimony that he had pushed his wife and

slapped his son in November 2007, which resulted in Petitioner's

arrest and conviction; the existence of restraining orders against

him prohibiting his possession of weapons and contact with his son;

and his wife's later filing another complaint, which resulted again

in Petitioner's arrest for violating the restraining order.  (RT

547, 553, 596-97.)

Further, the evidence of Petitioner's guilt was strong.  The

victim's testimony was corroborated by the discovery of the gun,

which had belonged to a friend of the Petitioner, where the victim

had testified that Petitioner left it.  The victim's testimony was

also corroborated by Petitioner's admissions to his cellmate of

having drugged the victim and having taken her away at gunpoint.

Other evidence indicated that Petitioner had planned to kidnap and

rape his wife, including Petitioner's purchase of the Subaru with

cash, having the windows tinted, and registering it in his

daughter's name; his placement of the duffle containing the douche

kits below the trap door, where his shoeprint was found; and

lacerations and swelling on the victim's body that indicated rough

treatment.

Contrary to Petitioner's assertions, the evidence was not close

with respect to whether Petitioner intended to commit a felony at

the time he entered the victim's house or bedroom.  Instead, the

independent evidence of planning was abundant and strongly supported

an inference that when entering the house and bedroom, Petitioner

fully intended to assault and rape the victim by overpowering the

victim with a gun, cuffs, and a drug.

In summary, the state court's application of the Strickland

standard was reasonable, and the state court's decision was not

contrary or, or an unreasonable application of, clearly established

federal law.

VI.   Instructional Error

Petitioner argues that his right to due process of law was

violated by the trial court's failure to instruct the jury that the

victim's extra-judicial statement to a forensic medical examiner was

not admissible for the truth of the matters asserted. Petitioner

contends the evidence should have been admitted only as support for

the expert's opinion, and the failure so to instruct the jury

improperly bolstered the victim's testimony.[2]

A.   The State Court's Decision

The pertinent part of the decision of the CCA regarding this issue, as well as the related issue of the alleged ineffective assistance of counsel in not requesting such an instruction, is as follows:

**II. Instructional Error**

Casner next contends that the trial court's use of
Judicial Council of California Criminal Jury Instructions
(2008) CALCRIM No. 318 (prior statements as evidence) was
prejudicial error because it applied to the testimony of
the forensic examining nurse. Casner argues that S.C.'s
statement to the forensic nurse essentially was identical
to her trial testimony and, as such, CALCRIM No. 318's
instruction that the earlier statement could be considered
true was prejudicial error because a victim's statement to
a forensic nurse is inadmissible for its truth.

Prior to instructing the jury, the trial court went
through each instruction with counsel and Casner present.
The trial court told counsel and Casner that it would
"just go through the instructions by number one more time.
If there is any objection, shout out. If there aren't, it
will be deemed as all parties are agreeing it should be
given." After going through all of the instructions,
including CALCRIM No. 318, the trial court asked if anyone
disagreed with any of the proposed instructions. Casner's
counsel responded, "No."

Casner's claim of instructional error has been forfeited.
To the extent Casner contends there should have been a

---

[2] As read to the jury, CALCRIM 318 stated the following:

You have heard evidence of statements that a witness made before trial.
If you decide that the witness made those statements, you may use those
statements in two ways: To evaluate whether the witness's testimony
in court is believable, and as evidence that the information in
those earlier statements are (sic) true.

(4 RT 719.)

clarification of CALCRIM No. 318, or a limiting instruction given, he was obligated to make such a request to the trial court in order to preserve the issue for appeal. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1134.)

Furthermore, to the extent Casner contends the issue is preserved, despite the failure to object or request clarification in the trial court, he is mistaken. Casner maintains that *People v. Key* (1984) 153 Cal.App.3d 888 supports his position and stands for the proposition that the trial court had a sua sponte duty to clarify or modify the pattern CALCRIM No. 318 instruction. In *Key*, the trial court gave an instruction on the use of prior crimes evidence, but failed to limit it to those crimes where prior crimes evidence properly is admissible. (*Key*, at p. 898.) The California Supreme Court has stated that the holding of *Key* is limited and is based on the principal (sic) that other crimes evidence cannot be used to prove that defendant engaged in wrongful conduct in the charged offense. (*People v. Heishman* (1988) 45 Cal.3d 147, 168.) CALCRIM No. 318 does not address prior crimes evidence and thus the holding of *Key* is inapplicable.

Additionally, CALCRIM No. 318 is not an instruction on the elements of an offense, thus an objection or request for clarification was required to be made in the trial court in order to preserve the issue for appellate review. It is only "[i]nstructions regarding the elements of the crime [that] affect the substantial rights of the defendant, [that require] no objection for appellate review. [Citations.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

Alternatively, Casner contends counsel was ineffective for failing to request a limiting instruction. As set forth in part I, *ante*, in order to demonstrate ineffective assistance of counsel, Casner must demonstrate prejudice. (*Strickland, supra*, 466 U.S. at p. 687; *Ledesma, supra*, 43 Cal.3d at pp. 216-218.) This he has failed to do.

First, Casner concedes that S.C.'s statement to the forensic nurse was admissible for the purpose of explaining the nurse's opinion that the physical injuries were consistent with the history taken from S.C. at the start of the exam. CALCRIM No. 318 does not instruct the jurors they must accept or presume a prior statement to be

true; it merely states that the jury may use the prior
statement to evaluate whether the witness's in-court
testimony is believable.

Furthermore, CALCRIM No. 226 (witnesses), with which the
jury was instructed, permits the jury to consider a prior
statement made by any witness and evaluate whether it is
consistent or inconsistent with trial testimony, as a
factor in evaluating the credibility of a witness. Thus,
any clarifying instruction directed at CALCRIM No. 318
would not have precluded the jury from considering S.C.'s
statement to the nurse and its consistency with her trial
testimony.

Second, there was a plethora of physical evidence
corroborating S.C.'s trial testimony. The physical
evidence included the douche kits and zip ties found in
S.C.'s home; the loaded gun found where S.C. said Casner
dropped it; the footprint matching Casner's in the crawl
space where the duffle bag was hidden; the subterfuge of
buying a car for cash and placing it in B.C.'s name; and
S.C.'s own physical injuries as documented in the forensic
exam. It is not reasonably probable that the outcome of
the trial would have been more favorable to Casner if a
limiting instruction had been given. (*Strickland, supra*,
466 U.S. at p. 687; *Ledesma, supra*, 43 Cal.3d at pp. 216-
218.)

(Doc. 28-1, 11-13.)

        B.   Procedural Default

    The doctrine of procedural default is a specific application of

the more general doctrine of independent state grounds.  It provides

that when state court decision on a claim rests on a prisoner's

violation of either a state procedural rule that bars adjudication

of the case on the merits or a state substantive rule that is

dispositive of the case, and the state law ground is independent of

the federal question and adequate to support the judgment such that

direct review in the United States Supreme Court would be barred,

the prisoner may not raise the claim in federal habeas absent a showing of cause and prejudice or that a failure to consider the claim will result in a fundamental miscarriage of justice.  Walker v. Martin, - U.S. -, 131 S.Ct. 1120, 1127 (2011); Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003); Wells v. Maass, 28 F.3d 1005, 1008 (9th Cir. 1994).  The doctrine applies regardless of whether the default occurred at trial, on appeal, or on state collateral review.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

Where a state court discusses a state procedural bar as a separate basis for its decision but then, in an alternative holding, discusses the merits of the federal claim, the court has clearly and expressly stated its reliance on a procedural ground, and the procedural bar applies.  Bennett v. Mueller, 322 F.3d at 580; Carriger v. Lewis, 971 F.2d 329, 333 (9th Cir. 1992) (citing Coleman v. Thompson, 501 U.S. 722 and Harris v. Reed, 489 U.S. at 264 n.10).

However, a procedural default is not jurisdictional.  Trest v. Cain, 522 U.S. 87, 89 (1997).  Instead, it proceeds from concerns of comity and federalism because a prisoner's failure to comply with a state's procedural requirement for presenting a federal claim has deprived the state courts of an opportunity to address the claim in the first instance.  Coleman v. Thompson, 501 U.S. at 831-32. Therefore, a court may bypass an issue of procedural bar in the interest of judicial economy, such as where the issue of procedural

default is complex and the claim may easily be resolved against the

petitioner.  Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (citing

28 U.S.C. § 2254(b)(2), which permits a federal court to deny a

habeas petition on the merits notwithstanding the applicant's failure

to exhaust state remedies); Franklin v. Johnson, 290 F.3d 1223, 1232

(9th Cir. 2002) (noting the power of appellate courts to reach the

merits of habeas petitions, if on their face and without regard to

any facts that could be developed in a lower court, they are clearly

not meritorious).

Here, the state court expressly ruled that the instructional

error claim had been forfeited because under state law, where the

instruction did not concern an element of an offense, the Petitioner

was required to object to the instruction or request clarification

in order to preserve the issue.  (Doc. 28-1, 12.)  Thus, the state

court expressly stated its reliance on a procedural ground.

However, the state court also indirectly addressed the merits

of the claim in its discussion of the ineffective assistance of

counsel, determining that even if there had been error in failing to

request a limiting instruction and/or in failing to move to strike

the car dealer's testimony, the errors were harmless.

Here, in the interest of economy, the underlying issues will be

addressed.

C.  Instructional Error

When a conviction is challenged in a proceeding pursuant to 28

28

U.S.C. § 2254 on the basis of error in jury instructions, this Court is guided by two clearly established legal principles.

First, the United States Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). A claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3).

Secondly, the only basis for federal collateral relief for instructional error is that the infirm instruction or the lack of instruction so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see, Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (it must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some right guaranteed to the defendant by the Fourteenth Amendment). Further, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72.

Additionally, in reviewing an ambiguous instruction, it must be determined whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. Estelle, 502 U.S. at 72-73 (reaffirming the standard stated in Boyde v. California, 494 U.S. 370, 380 (1990)). Estelle

1 emphasized that the Court had defined the category of infractions

2 that violate fundamental fairness very narrowly, and that beyond the

3 specific guarantees enumerated in the Bill of Rights, the Due

4 Process Clause has limited operation.  Id. at 72-73.

5     Moreover, even if there is instructional error, a petitioner is

6 generally not entitled to habeas relief for such error unless it is

7 prejudicial.  The Supreme Court has held that harmless error

8 analysis applies to instructional errors as long as the error at

9 issue does not categorically vitiate all the jury's findings.

10 Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (citing Neder v. United

11 States, 527 U.S. 1, 11 (1999) (quoting in turn Sullivan v.

12 Louisiana, 508 U.S. 275 (1993) concerning erroneous reasonable doubt

13 instructions as constituting structural error)).  In Hedgpeth v.

14 Pulido, the Court cited its previous decisions that various forms of

15 instructional error were trial errors subject to harmless error

16 analysis, including errors of omitting or misstating an element of

17 the offense or erroneously shifting the burden as to an element.

18 Hedgpeth, 555 U.S. 60-61.  To determine whether a petitioner

19 pursuant to § 2254 suffered prejudice from such an instructional

20 error, a federal court must determine whether a petitioner suffered

21 actual prejudice by assessing whether, in light of the record as a

22 whole, the error had a substantial and injurious effect or influence

23 in determining the jury's verdict.  Hedgpeth, 555 U.S. at 62; Brecht

24 v. Abrahamson, 507 U.S. 619, 638 (1993).

25     Here, Holly Price testified that as a registered nurse and a

26 certified sexual assault nurse examiner at Doctor's Medical Center,

27 she took a statement from the victim and examined her on May 8.  (RT

28 369-72.)  The nurse testified to the victim's statement, which

narrated in detail the events of the offenses, including the entry, rape, threats, kidnapping, and rape. (Id. at 372-80.)  The nurse further testified to her examination of the victim and detailed the findings that were consistent with the victim's narration, including the presence of body secretions in her pubic hair and swelling and lacerations of the genital area.  (Id.)

     As noted by the state court, Petitioner conceded on appeal that the statement to the forensic nurse was admissible for explaining the nurse's opinion that the physical injuries were consistent with the history taken from the victim at the start of the exam.   The jury was instructed that it had heard evidence of statements made by a witness before trial and, if it decided that the witness made those statements, it could use the statements to evaluate whether the witness's in-court testimony was believable, and as evidence that the information in those earlier statements was true.  (Id. at 719.)  The jury was also instructed that it could consider any factor tending to prove or disprove the truth of a witness's testimony, including whether the witness had made a prior consistent or inconsistent statement. (4 RT 714-15.)  The jury was further instructed on what to consider in evaluating an expert opinion: to use the general instructions concerning credibility or witnesses, to consider the facts or information on which the expert relied in arriving at the opinion, and to decide whether the information was true and accurate.  (Id. at 719-20.)  Thus, the jury was instructed in effect to consider the story that the victim told the nurse as well as the findings on examination to evaluate the opinion that the findings on examination were consistent with the victim's statement to the examiner.

It is logically possible that jurors would understand the instructions to mean that jurors could consider the truth of the matters in the victim's statement to the examining nurse in order to determine whether the victim's later testimony at trial was true. It is this possibility that Petitioner's contention addresses. Petitioner argues that it was unfair because it gave an additional basis for a favorable credibility finding with respect to the victim.

However, as noted by the state court, even if there was error in failing to request a limiting instruction as to the nurse's testimony and moving to strike the testimony of the car dealer, there was no prejudice.  The jury was presented with very strong evidence of Petitioner's guilt independent of the victim's testimony, including a wealth of evidence of planning the offenses that has previously been summarized, such as the gun, handcuffs, and the footprint in the house; physical evidence from the nurse's examination; Petitioner's motivation to kill the victim because her complaints to law enforcement had resulted in his conviction, sentence, and yet another criminal charge; Petitioner's admissions that he committed the offense; and his invitation to his cell mate to kill the victim.  Petitioner's version of the journey he took his wife on was patently unlikely in view of the pendency of a restraining order and an additional criminal charge concerning a repeat violation of the restraining order.

In light of the totality of the evidence presented to the jury, the fact that the victim's statement to the nurse might have been considered for its truth would have had little, if any, impact.  The primary significance of the nurse's testimony was to establish that

the results of the forensic exam were consistent with the victim's description of the events.  Although Petitioner argues that the instructional omission raised a risk that the jury would consider repetition of the victim's history of the events as corroboration of her in-court testimony, the jury was presented with considerable weighty, independent evidence of circumstances that corroborated the victim's testimony.

Any error regarding the forensic nurse's testimony did not categorically vitiate all the findings of the jury.  The state court could reasonably have decided that the possibility that jurors considered the statement made to the nurse for the truth of the matters asserted in the statement did not have a substantial and injurious effect or influence in determining the jury's verdict.

Petitioner argues for the first time in the traverse that the instruction permitting the jury to consider the victim's statement to the forensic nurse was irrational, created a presumption, and lowered the burden of proof beyond a reasonable doubt.

A jury instruction violates due process if it fails to give effect to the requirement that the government prove every element of the offense beyond a reasonable doubt.  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  An ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation only where the instruction so "'infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The defective instruction must be viewed in the context of the overall charge; if the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has

applied the challenged instruction in a way that violates the Constitution.  Boyde v. California, 494 U.S. 370, 378 (1990); Estelle, 502 U.S. at 72.

The jury was instructed on the presumption of innocence and the People's overall burden of proof beyond a reasonable doubt, as well as the need to meet the same burden of proof with respect to all facts essential to a conclusion based on circumstantial evidence and circumstantial evidence of the defendant's state of mind.  (4 RT 711-13.)  Although CALCRIM 318 referred to considering the nurse's testimony concerning Petitioner's statement for the truth of the matters stated, the jury was instructed that it could consider anything that reasonably tended to prove or disprove the truth or accuracy of the testimony, including the witness's ability to remember and describe what happened, and whether the witness made a statement in the past that was consistent or inconsistent with his or her testimony.  (Id. at 714-15.)  The jury was also instructed that it was the sole judge of the believability of a witness.  (Id. at 714.)  Considering the instructions as a whole, the burden of proof was clearly set forth.

However, even if ambiguous, it does not appear reasonably likely that the jury would have understood that CALCRIM 318 created a separate standard or modified the burden of proof with respect to the victim's statement to the nurse.

Petitioner argues that the instruction created a presumption that the victim's statement to the forensic nurse was true.  However, CALCRIM 318 did not by its terms compel the finder of fact to accept the out-of-court statements as true.  It instead permitted use of the out-of-court statement to evaluate the credibility of the

34

1  victim's in-court testimony and as evidence that the information in
2  those earlier statements was true.  In light of the totality of the
3  instructions concerning the burden of proof and evaluation of the
4  credibility of witnesses, the Court concludes it was not reasonably
5  likely that the jury understood CALCRIM 318 to create a presumption
6  or modify the burden of proof.

7      Even assuming that failure to strike the statement of the car
8  dealer that she was scared of Petitioner was erroneous or
9  substandard, the presence of significant, independent evidence that
10 Petitioner was worthy of fear rendered the omission harmless.
11 Considering the totality of alleged errors in light of the whole
12 record, the state court reasonably decided that Petitioner had not
13 shown prejudice or a denial of fundamental fairness.

14     VII.   Ineffective Assistance of Counsel

15     Petitioner argues that his counsel was ineffective for failing
16 to seek an instruction limiting the use of the victim's statement to
17 the nurse so that the jury could not consider the truth of the
18 matters asserted in the statement to the nurse.

19     Even assuming that the failure to seek the instruction was
20 substandard, the state court's decision was not an objectively
21 unreasonable application of the Strickland standard.  The state
22 court determined that it was not reasonably probable that the result
23 would have been different if a limiting instruction had been given.
24 The jury was given the victim's testimony in court and multiple
25 sources of credible evidence, physical and testimonial, that
26 corroborated the victim's testimony in numerous particulars.  The
27 chief import of the nurse's testimony was to present the jury with
28 the findings on her examination, which were consistent with the

1   victim's testimony that she had had sexual relations and that

2   Petitioner's sexual advances were painful.

3       In summary, with respect to all issues raised, Petitioner has

4   not shown that the state court decision was contrary to, or an

5   unreasonable application of, clearly established federal law within

6   the meaning of § 2254(d)(1).  Thus, the petition will be denied.

7       VIII.  <u>Cumulative Error</u>

8       Although Petitioner did not raise a claim of cumulative error

9   as such in the petition for review that he filed in the CSC (LD 4,

10  ii, 2, 1-19), in the foregoing analyses this Court has considered

11  the cumulative prejudice of all errors raised by Petitioner.

12      IX.  <u>Certificate of Appealability</u>

13      Unless a circuit justice or judge issues a certificate of

14  appealability, an appeal may not be taken to the Court of Appeals

15  from the final order in a habeas proceeding in which the detention

16  complained of arises out of process issued by a state court.  28

17  U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336

18  (2003).  A certificate of appealability may issue only if the

19  applicant makes a substantial showing of the denial of a

20  constitutional right.  § 2253(c)(2).

21      Under this standard, a petitioner must show that reasonable

22  jurists could debate whether the petition should have been resolved

23  in a different manner or that the issues presented were adequate to

24  deserve encouragement to proceed further.  <u>Miller-El v. Cockrell</u>,

25  537 U.S. at 336 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484

26  (2000)).  A certificate should issue if the Petitioner shows that

27  jurists of reason would find it debatable whether: (1) the petition

28  states a valid claim of the denial of a constitutional right, or (2)

jurists of reason would find it debatable whether the district court was correct in any procedural ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  Id.  An applicant must show more than an absence of frivolity or the existence of mere good faith; however, an applicant need not show the appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.  Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, the Court will decline to issue a certificate of appealability.

X.   Disposition

In accordance with the foregoing analysis, it is ORDERED that:

1) The petition for writ of habeas corpus is DENIED; and

2) Judgment be ENTERED for Respondent; and

3) The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

Dated:   **August 6, 2013**              **/s/ Sheila K. Oberto**
                                       UNITED STATES MAGISTRATE JUDGE